AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

8/2/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ER___ DEPUTY

| | |
|---|---|
| United States of America<br><br>v.<br><br>SERGHEI COLODII,<br><br>Defendant | Case No. 2:25-mj-04824-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of August 1, 2025, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1029(a)(2) | Use of Unauthorized Access Devices |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Derek Wang
*Complainant's signature*

Derek Wang, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: August 2, 2025 at 1:19 p.m.

*Judge's signature*

City and state: Los Angeles, California

Hon. Rozella A. Oliver, U.S. Magistrate Judge
*Printed name and title*

SAUSA: Robert Quealy, x6874

**AFFIDAVIT**

I, DEREK WANG, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am a Special Agent ("SA") with the United States Secret Service ("USSS"), Department of Homeland Security ("DHS"), and have been so employed since November 22, 2021. I am currently assigned to the HSI El Camino Real Task Force, where I investigate criminal violations related to federal institution fraud, including, but not limited to, wire fraud, access device fraud, identity fraud, computer fraud, and money laundering.

2. I have received both my bachelor's degree in Biology (Evolution, Ecology, and Behavior) and my master's degree in Information Security and Privacy from The University of Texas at Austin. In becoming a Special Agent, I have completed advanced criminal investigative training, including the Criminal Investigator Training Program from the Federal Law Enforcement Training Center in Glynco, Georgia. I have also continued my extensive training at the James J. Rowley Training Center with the USSS in Beltsville, Maryland, including the Basic Investigation of Computer and Electronic Crime Program, Network Intrusion Triage and Response, and training on genuine currency printing and manufacturing process, and investigative techniques and tactics regarding financial crimes, cyber-crimes, and crypto-enabled fraud. Prior to my tenure as a Special Agent, I was employed as a Senior Cyber Consultant and Anti-Money Laundering Specialist at Deloitte and Ernst & Young for over

five years with experience in penetration and vulnerability testing, business continuity, disaster recovery, networking, security incident and event management, phishing attacks, ransomware, social engineering, Red Hat Operations, and anti-money laundering projects (Know Your Customer and Financial Crimes Prevention) for large financial institutions.  Prior to working as a Consultant, I served in the United States Marine Corps as a Combat Engineer for four years with extensive experience in explosive ordnance deployment, IED sweeping and identification, civil engineering, applied demolitions science, and weapons handling.

## II. **PURPOSE OF AFFIDAVIT**

3. This affidavit is made in support of a criminal complaint and arrest warrant against SERGHEI COLODII ("COLODII") for a violation of 18 U.S.C. § 1029(a)(2) (Use of Unauthorized Access Devices).  This affidavit is also made in support of a search warrant for a black Apple cellular phone seized from COLODII (the "SUBJECT DEVICE") on August 1, 2025, and currently in the custody of Homeland Security Investigations ("HSI"), in Paramount, CA, as described more fully in Attachment A.  The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 1029 (Fraud and Related Activity in Connection with Access Devices), 1344 (Bank Fraud), and 1028A (Aggravated Identity Theft) (collectively, the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

### III.  SUMMARY OF PROBABLE CAUSE

5.     Between January 2024 and January 1, 2025, the California Department of Social Services ("DSS") has detected more than $126.8 million in stolen funds from victim Electronic Benefit Transfer ("EBT") cards.  This fraud is from two specific programs known as CalFresh and CalWORKs, which help low-income households pay for housing, food, and other necessary expenses.  Many of the fraudulent withdrawals are done at specific ATMs in the Central District of California.

6.     On or about August 1, 2025, at approximately 5:30 a.m., law enforcement conducted physical surveillance at a U.S. Bank and Citibank co-located at 10900 Wilshire Boulevard, Los Angeles, CA 90024 (the "Target Bank"), which was identified by DSS as one of the top ATM locations for EBT fraud.  At approximately 06:15 a.m., law enforcement saw COLODII arrive at an ATM terminal located at the Target Bank where law enforcement

3

was conducting surveillance. COLODII withdrew approximately $1100 in cash from the ATM using one access device in addition to performing approximately nine (9) balance inquiries in rapid succession using approximately nine (9) other access devices. Law enforcement detained COLODII and found approximately 63 access devices (later determined to be cloned cards, one (1) of which had the same EBT card information COLODII used to withdraw $1100 in cash from the ATM). COLODII was arrested and found to be in possession of approximately $2983 in cash and the SUBJECT DEVICE.

## IV. STATEMENT OF PROBABLE CAUSE

7. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. Regulatory Background of CalFresh and CalWORKs Programs

8. DSS is a government agency that administers several benefit and assistance programs for residents of the state of California. One of the assistance programs administered by DSS is called CalFresh (formerly known as food stamps), which helps low-income households purchase food and household items to meet their nutritional needs. Another assistance program administered by DSS is called CalWORKs, which helps low-income families with children pay for housing, food, and other necessary expenses.

9. Residents of California that meet the criteria established by the CalFresh or CalWORKs programs can apply

online for benefits at www.getcalfresh.org and www.benefitscal.com.  Beneficiaries apply for benefits by submitting their income and number of dependents to determine their benefit eligibility.

    10.  CalFresh and CalWORKs benefits are issued through Electronic Benefit Transfer cards ("EBT cards").  EBT cards are mailed to an address designated by the account holder and function like traditional debit cards to conduct transactions.  For example, you can use an EBT card to make a purchase at a grocery or convenient store by swiping the card at a point-of-sale terminal.

    11.  The EBT cards issued under CalFresh and CalWORKs are assigned specific Bank Identification Numbers ("BIN").  A BIN refers to the first five digits of the account number on a debit or credit card and can be used to identify the issuer of the card, like DSS, which administers the CalFresh and CalWORKs programs.

    12.  Benefits received through the program are typically disbursed to EBT cardholders by DSS during the beginning of each month.  Those benefits are deposited directly from DSS into the account of the EBT cardholder.

    13.  The EBT cardholders can then conduct cash withdrawals at automated teller machines ("ATMs") using a personal identification number ("PIN") established by the card holder. The EBT cardholder presents the card at an ATM, inserts the card into the ATM card reader, and utilizes a PIN to withdraw the

5

funds previously deposited by DSS intended for beneficiaries of the CalFresh or CalWORKs programs.

**B.   Background on EBT Fraud in the Los Angeles Area**

14.  Since in or about August 2022, local law enforcement has been working with DSS to investigate a significant increase in unauthorized cash withdrawals utilizing EBT cards.  Based on analysis of victim complaints to DSS, victim complaints to local law enforcement, bank records, and surveillance, law enforcement determined that the majority of the unauthorized cash withdrawals were being conducted with cloned cards.

15.  A cloned card can be a blank white plastic card or another debit, credit or gift card that contains altered information on the card's magnetic stripe.  Based on my training and experience, I know that suspects will often clone cards by taking stolen card information from a victim card's magnetic stripe and re-encode that stolen information onto another card's magnetic stripe.  Cloning these cards allows the suspect to use the card and the DSS benefits added on to the account linked to the card for illicit purchases or unauthorized cash withdrawals.

16.  On a legitimate debit or credit card, the information contained on the card's magnetic stripe will match the information embossed on the front of the card.  This information includes the account number, expiration date, and cardholder's name, among other information.  Whereas on a cloned card, the information contained on the magnetic stripe will not match the information embossed on the front of the card.  For example, if a suspect re-encodes victim EBT card information onto a pre-

existing gift card's magnetic stripe or a blank white plastic card with a magnetic stripe, the magnetic stripe will be encoded with the EBT card information, but the card itself will still bear the embossed information of the gift card or bear no information if it is a blank white plastic card.

17. Based on my training, experience, and participation in this investigation, I know that the victim card data harvested to clone cards is often obtained from what is colloquially referred to as "skimming activity."

18. The term "skimming" is used to describe activity that involves unlawfully obtaining debit and credit card information by using technological devices to surreptitiously record victim accountholder's debit and credit card numbers and personal identification numbers at, for example, ATMs or point-of-sale terminals. For example, individuals conducting ATM "skimming" may install a skimming device into the card reader of the ATM to record the debit or credit card numbers, as well as a camera or keypad overlay on the ATM keypad to record the associated PIN number. Those individuals will then return to the ATM to collect the card number and PIN information stored on the installed device.

19. As described above, suspects then manufacture cloned and fraudulent debit or credit cards that bear the victim accountholder's account information that was obtained from skimming. Once that information is loaded onto another fraudulent card (e.g., a gift card or blank plastic card), members of the scheme then use that fraudulent card to withdraw

cash from the victim accountholder's bank accounts or to make purchases with the victim accountholder's account.

20. The most current data provided by DSS, based in part upon reported fraud by victims, indicates that between January 2024 and January 1, 2025, more than approximately $126.8 million in cash benefits has been stolen from victim EBT cards throughout California. Of the more than $126.8 million in cash benefits stolen during this one-year period, more than $57.9 million has been stolen from victim EBT cards in the county of Los Angeles alone. Most of these funds were stolen through unauthorized ATM withdrawals.

21. Based upon my training and experience conducting access device fraud investigations, I know that suspects committing access device fraud schemes will often target particular BINs when harvesting stolen card information collected from skimming devices. Thus, suspects using skimming may target the BIN associated with DSS, in essence, targeting CalFresh and CalWORKs benefits. Moreover, based upon my training and experience, the sheer volume of unauthorized ATM withdrawals occurring during the early days of the month is further indicative that suspects participating in the fraud scheme at issue are targeting EBT cards because benefits are typically disbursed to EBT cardholders during the early days of each month.

22. Law enforcement has also reviewed ATM surveillance provided by financial institutions that administer EBT accounts that relate to the fraud scheme at issue. During the

8

unauthorized ATM withdrawals, suspects can often be seen holding stacks of cards and conducting withdrawals in quick succession at one ATM. Based upon my training and experience, I know that suspects perpetrating access device fraud schemes will often conduct unauthorized withdrawals using cloned cards in rapid succession at ATMs.

23. Based upon the rapid succession of unauthorized ATM withdrawals being conducted, the fact that the cards being used to conduct the unauthorized cash withdrawals are nearly all cloned EBT cards, and the fact that nearly all of the unauthorized withdrawals are happening during the early days of the month, I believe that suspects participating in the fraud scheme at issue are ostensibly targeting EBT cards.

    **C.    COLODII Committed EBT Fraud Using Unauthorized Access Devices on August 1, 2025**

24. Based upon the large dollar amount being stolen from victim EBT cards, the number of victims impacted, the concentration of unauthorized ATM withdrawals occurring in particular areas, and the large number of unauthorized ATM withdrawals occurring at singular bank locations, law enforcement conducted a surveillance and arrest operation on August 1, 2025.

25. Based upon my training and experience, I know EBT cardholders are not able to conduct cash withdrawals from their EBT cards between 12:00 a.m. and 6:00 a.m.

26. On or about August 1, 2025, beginning at approximately 05:30 a.m., law enforcement began surveillance of the Target Bank.

27. At approximately 06:15 a.m., based on my review of surveillance footage, COLODII walked up to the Target Bank ATM terminal. Law enforcement saw COLODII conduct multiple transactions, which appeared to be balance inquiries and a withdrawal based upon law enforcement observing COLODII retrieve what appeared to be currency at the conclusion of each transaction. Law enforcement watched COLODII for approximately six (6) minutes while COLODII conducted what appeared to be several withdrawal transactions in rapid succession. Law enforcement observed COLODII appear to insert several different cards to conduct the withdrawals and put the retrieved currency into his pockets. Based upon my training and experience, individuals conducting legitimate transactions at ATMs typically conduct a single transaction and do not transition between multiple payment cards in rapid succession to conduct several transactions within a short period of time.

28. Based on the date, time, ATM location, presence of multiple, and successive ATM withdrawals on multiple EBT cardholder accounts during a short time period, law enforcement detained COLODII in order to investigate further.

29. Law enforcement found approximately 63 cloned cards in a black bag which COLODII was wearing across his body. 63 of the cloned cards consisted of grey, plastic payment cards with magnetic stripes and had "American Express" written on the

front.  The cards also had writing on the back with what appeared to be, based on my training and experience, card balances and victim PINs.  The following photo is an example of a seized cloned card:

 

30.  I analyzed the magnetic stripe of the cloned cards and determined all of them were encoded with mismatching card numbers.  61 of the cards were encoded with EBT BINs.  The remaining two (2) cards were encoded with unknown BINs at this time.  Moreover, the backs of the cloned cards contained written victim PIN numbers that corresponded to the PIN required to conduct the unauthorized ATM withdrawal, as well as balance figures which closely corresponded to the withdrawal amounts for each cloned card.

31.  Based on my review of ATM surveillance stills and logs from U.S. Bank, I saw COLODII perform ten (10) transactions involving EBT card numbers -- all of which matched EBT card numbers encoded on the cloned card seized from COLODII at the

11

time of his arrest. One (1) of those transactions was a successful withdrawal totaling $1100 in financial loss. The remaining nine (9) were attempted but not authorized balance inquiries which, based on my training and experience, are necessary pre-requisites for conducting unauthorized withdrawals from victim accounts. COLODII had approximately $2983 in cash in the black bag he was wearing. U.S. Bank ATM surveillance photographs obtained by law enforcement also clearly depicted COLODII at the ATM conducting the unauthorized withdrawal using cloned EBT cards and directly corroborated law enforcement's surveillance observations.

32. Based on my review of EBT cardholder information obtained from DSS, none of the EBT cards used by COLODII to withdraw funds from the ATM belonged to him.

33. During processing, COLODII admitted to being a citizen and national of Moldova. COLODII did not state anything pertaining to his U.S. legal status.

34. During processing, COLODII provided a Washington drivers license which was later determined to be legitimate based upon the positive identification of COLODII by law enforcement.

35. Law enforcement queried COLODII in U.S. Immigration and Customs Enforcement databases and learned that COLODII has no lawful status. His visa was revoked on September 24, 2015, and his visa application was refused on April 26, 2017.

36. The SUBJECT DEVICE was retrieved from COLODII's pockets and placed into airplane mode to secure the device pending issuance of a search warrant.

37. After being advised of his Miranda rights, COLODII declined to speak with law enforcement.

## V.  TRAINING AND EXPERIENCE ON IDENTITY THEFT CRIMES

38. Based on my training and experience and information obtained from other law enforcement officers who investigate identity theft, I know the following:

   a. It is common practice for individuals involved in identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once. Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft. Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet. They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

b.   Oftentimes identity thieves take pictures of items reflecting their stolen identities, including items retrieved from stolen mail or mail matter, with their cellphones.

c.   It is also common for identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.  Identity thieves often keep such information in their cars, storage units, and in their digital devices.

d.   It is common for identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards.  These types of devices are routinely kept where the person will have easy access to such devices, such as on their person or in their cars or homes or storage units.  Software relevant to such schemes can also often be found on digital devices, such as computers.

e.   Based on my training and experience, I know that individuals who participate in identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and

14

often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices.  Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.  Suspects may also have paper copies of such records, which they may keep on their person or in their cars, homes, or storage units.

   f. Individuals engaged in mail and identity theft often use multiple digital devices, which they may keep on their person or in their cars or homes.

## VI. **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

39. As used herein, the term "digital device" includes the SUBJECT DEVICE.

40. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

   a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary

directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

   b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

41. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

    b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

42. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

43. For all the reasons described above, there is probable cause to believe that COLODII violated 18 U.S.C. § 1029(a)(2) (Use of Unauthorized Access Devices).

44. Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits,

and instrumentalities of violations of the Subject Offenses will be found in the SUBJECT DEVICE, as described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 2nd day of August, 2025.

_____
HON. ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE